[Cite as *Payne v. Ohio Dept. of Rehab. & Corr.*, 2017-Ohio-7155.]

| | |
|---|---|
| SCOTT PAYNE | Case No. 2015-00953 |
| Plaintiff | Magistrate Robert Van Schoyck |
| v. | DECISION OF THE MAGISTRATE |
| OHIO DEPARTMENT OF REHABILITATION AND CORRECTION, et al. | |
| Defendants | |

{¶1} Plaintiff, an inmate in the custody and control of defendant, Ohio Department of Rehabilitation and Correction (ODRC), brought this action for negligence. According to the complaint, an agent or employee of ODRC negligently drove a truck away from a loading dock while plaintiff was unloading the truck in the course of a work assignment, and, as a result, plaintiff fell and sustained injury. As set forth in the order issued on January 18, 2017, the parties stipulated that for purposes of plaintiff's claim of negligence ODRC breached a duty of care owed to plaintiff and proximately caused plaintiff some harm. The case proceeded to trial on the issue of damages to determine the nature and extent of the harm proximately caused by ODRC's negligence.

{¶2} At trial, plaintiff testified that for about three years leading up to the accident he worked for an Ohio Penal Industries operation at the Grafton Correctional Institution (GCI), where he is incarcerated. Plaintiff stated that while on the job on May 16, 2014, he was directed to help a corrections officer unload a delivery truck at a loading dock. Plaintiff related that before he and the corrections officer were finished unloading the truck, another officer got in the cab of the truck and started to drive away, causing plaintiff and the officer he was working with to fall off the back of the truck and onto the pavement at the foot of the dock.

{¶3} According to plaintiff, a metal dock plate on the back of the truck had been held down over the precipice of the dock while the truck was being unloaded, but as the truck pulled away from the dock the plate sprang upward. By plaintiff's description, the dock plate struck and injured him on his right side as he started to fall, making the fall more awkward, and when he landed on the pavement about five-and-a-half feet below the truck bed, the corrections officer whom he had been helping fell on top of him. Plaintiff testified that he felt shaken up and scared to move, and his right side ached all over where the dock plate struck him on the right elbow, midsection/back, hip, and lower leg.

{¶4} Plaintiff stated that he felt like he was in shock but was able to get up and walk slowly under his own power with the corrections officer to the shift office to see a supervisor, and then they walked to the infirmary to be examined by a nurse. Plaintiff recounted that he described his symptoms to the nurse, including pain all over the right side and bruising in the midsection, and that the nurse examined and treated him with a bandage and prepared a Medical Exam Report. (Plaintiff's Exhibit 3.) At that point, plaintiff testified, he was released from the infirmary and returned to his dormitory.

{¶5} According to plaintiff, due to persistent soreness and pain on his right side and back, as well as a wound on his right elbow, a nurse practitioner followed up with him. The nurse practitioner gave him Tylenol and instructed him to apply ice to the affected areas, plaintiff testified. But, plaintiff related that he continued to experience stiffness and persistent aching pain in his right hip, leg, and back. Plaintiff stated that he eventually saw Dr. Todd Houglan for an appointment. Plaintiff recalled that Dr. Houglan gave him a trigger point injection in his back and prescribed medications which he cannot remember, but which were ineffective at relieving his pain and some of which made him sick. Plaintiff testified that he continued to see Dr. Houglan several more times, and that now he sees Dr. Janice Douglas, who replaced Dr. Houglan at GCI.

{¶6} Plaintiff stated that stretching exercises were prescribed for him and that he showed up to any scheduled physical therapy appointments, but that he was physically

unable to perform all the exercises, and he denied any suggestion that he refused to participate. Plaintiff stated that he has continued to receive trigger point injections in his back approximately every 90 days. Plaintiff also testified that he took any prescribed medications as directed, including over-the-counter ibuprofen and Tylenol that he was instructed to purchase at the commissary. According to plaintiff, however, medication does not help and the trigger point injections only calm the pain somewhat for no more than about 30 days at a time. Otherwise, plaintiff testified, he has never been able to obtain any relief at all. Plaintiff stated that he has requested to see a neurologist or other specialist many times, but has never been able to do so.

{¶7} Plaintiff testified that the nature and severity of the pain varies to some extent, but in general the back throbs and the hip pain is of a sharper nature, and overall on a scale of 1 to 10, the pain is generally about a 10. According to plaintiff, who is now 47 years old, he did not have problems with his back and hip before the accident. Plaintiff stated that since the accident, however, he has had to depend on assistance from other inmates with lifting heavy objects, he cannot participate in recreation, he cannot sit for long periods of time, and he cannot walk as well as he used to. Plaintiff explained that he suffered a fall sometime after the accident and consequently began using a walking cane, which he had with him at trial, and he also wore a back brace over top of his shirt at trial. Plaintiff testified that he has a "bottom bunk" restriction and has another restriction limiting him to "light duty" work, such as his current job which requires him to clean the microwave in his housing unit. Plaintiff also testified that he lives on an upper range and has a hard time going up the stairs.

{¶8} Dr. Todd Houglan testified that after working in private practice for several years he took a job in 2010 as Chief Medical Officer at GCI, where he treated patients and oversaw the medical department. Dr. Houglan recounted that he stayed in that role for nearly six years before transferring to the Lorain Correctional Institution (LorCI). Dr. Houglan testified that he cannot remember specifically when he first saw plaintiff,

but that he remembers treating plaintiff and he gave testimony pertaining to medical records documenting plaintiff's care and treatment.

{¶9} Dr. Houglan testified about a report from x-rays that were taken at ODRC's Franklin Medical Center on May 22, 2014, six days after the accident.  (Defendants' Exhibit D.)  The report, Dr. Houglan explained, shows that x-rays were taken of both the right hip and the lumbar spine.  The report for the right hip documented that there were no significant abnormalities and that the soft tissue was unremarkable, Dr. Houglan stated.  As for the lumbar spine, Dr. Houglan stated that mild to moderate degenerative changes were noted, most significantly at the L-4/L-5 and L-5/S-1 levels of the spine, and that this finding is consistent with degenerative disc disease, representing natural wear and tear over time of the discs between vertebrae.  Regarding the finding of no significant acute osseous abnormality, Dr. Houglan explained that such an abnormality would represent an acute problem with a bony structure, such as a vertebral fracture, which happens suddenly rather than over time.  Dr. Houglan also stated that a report from x-rays of the lumbar spine and thoracic spine taken four years earlier, in 2010, noted mild degenerative changes as well, including narrowing at the L-5/S-1 level. (Defendants' Exhibit C.)

{¶10} From progress notes dated June 13, 2014, Dr. Houglan testified that when he saw plaintiff on that date he administered a trigger point injection into the area of pain in the lower back.  (Plaintiff's Exhibit 1, p. 143; Defendants' Exhibit A, p. 143.) Dr. Houglan explained that plaintiff was injected with Kenalog, a corticosteroid, to reduce inflammation, and that as plaintiff's back pain persisted he continued to provide these injections approximately every three months.  Dr. Houglan also prescribed a three-week dose of the muscle relaxant Flexeril, he stated, because when back pain persists over time there can be muscle spasms.  Additionally, Dr. Houglan stated that he advised plaintiff to perform stretching exercises for his back to increase mobility and reduce pain, and that plaintiff would have been given a handout with instructions that were standardly issued when a patient complained of back pain.

{¶11} Dr. Houglan testified that progress notes show he saw plaintiff again on August 6, 2014. (Plaintiff's Exhibit 1, p. 143; Defendants' Exhibit A, p. 143.) Dr. Houglan stated that plaintiff reported to him that the lower back pain had improved but still ached on the right side down into the hip, especially when he sat for an extended period, but would improve with activity. By Dr. Houglan's account, plaintiff was using a walking cane and the muscles on either side of the spine in the lower region of the back were sensitive to the touch, but otherwise he observed a full range of motion in the lower spine and his findings were normal. Dr. Houglan testified that he prescribed Prednisone and gave plaintiff an injection of Toradol to reduce inflammation, and ordered another set of x-rays. Dr. Houglan also testified that he checked the records of plaintiff's commissary purchases during the appointment and found that plaintiff was not purchasing Tylenol as he had been instructed.

{¶12} Dr. Houglan related that progress notes from September 19, 2014, document another appointment for plaintiff's complaints of low back pain. (Plaintiff's Exhibit 1, p. 142.) According to the notes, plaintiff reported that the anti-inflammatories provided some temporary relief. Dr. Houglan stated that he found some pain upon touching the lower right back, but that all reflexes were normal, and that he went over the most recent x-ray results with plaintiff, which again showed mild to moderate changes associated with degenerative disc disease. By Dr. Houglan's description, plaintiff did not seem to be malingering and had an antalgic gait even when he was not under close observation, but his limp was "more theatrical" when he knew that he was being observed. According to Dr. Houglan, he observes patients when they walk down the hall and enter the exam room and also watches them when they leave because it is not uncommon for the patients' presentation to be different when they know they are being watched. Nonetheless, Dr. Houglan stated that from what he can recall over time, plaintiff more or less maintained an antalgic gait that was consistent with his complaints of low back and hip pain. Dr. Houglan testified that he gave plaintiff another injection of

Toradol, as well as a prescription for a different anti-inflammatory, Relafen, and he instructed plaintiff to continue buying over-the-counter Tylenol in the commissary.

{¶13} On October 7, 2014, plaintiff received another trigger point injection of Kenalog in the right lumbar paraspinal muscles and was instructed to continue using Tylenol and perform stretching exercises, Dr. Houglan stated. (Plaintiff's Exhibit 1, p. 60; Defendants' Exhibit A, p. 60.) When he saw plaintiff again on December 1, 2014, Dr. Houglan stated, plaintiff reported that achy low back pain was still present, rating it at a 10 out of 10, but that the trigger point injections were helping some. (Plaintiff's Exhibit 1, p. 60; Defendants' Exhibit A, p. 60.) Dr. Houglan testified that he found pain to the touch in the lower right paraspinal muscles, and that plaintiff had a slow antalgic gait. Dr. Houglan also testified that he wrote he might request an MRI for the lumbar spine. Dr. Houglan stated that he saw plaintiff a few days later, on December 7, 2014, and recorded giving a trigger point injection of Kenalog in the left lumbar area, continuing the prescription for Relafen, and telling plaintiff to continue taking Tylenol and stretching. (Plaintiff's Exhibit 1, p. 58; Defendants' Exhibit A, p. 58.) Progress notes from December 23, 2014, correspond to another trigger point injection of Kenalog in the right lumbar area, Dr. Houglan stated, and he noted that again plaintiff was instructed to take Tylenol and perform stretching exercises. (Plaintiff's Exhibit 1, p. 58; Defendants' Exhibit A, p. 58.)

{¶14} About six months later, Dr. Houglan stated, plaintiff was sent out for an MRI of the lumbar spine, taken at Franklin Medical Center on June 12, 2015. Dr. Houglan testified that the MRI report noted some compression on both sides of the spine where the nerve pathways exit the spine, which can be a symptom of degenerative disc disease, and a bulging disc was noted at the L-4/L-5 level. (Defendants' Exhibit E.) Overall, Dr. Houglan explained, the report demonstrates degenerative changes at several levels of the lumbar spine, most prominently at the L-4/L-5 and L-5/S-1 levels, which corresponds to the area where plaintiff complained of pain. Dr. Houglan related that from looking at the report, one cannot know how long the changes in the spine

have been present, and that he is not aware of any prior MRI with which to compare. According to Dr. Houglan, compared to the 2014 x-rays this MRI showed more stenosis, or narrowing, and is consistent with continuing degenerative changes, but the additional level of detail provided by an MRI versus an x-ray could account for the difference.

{¶15} The following month, on July 15, 2015, plaintiff was sent to Franklin Medical Center for an electromyograph (EMG), the results of which were normal, Dr. Houglan stated. (Defendants' Exhibit B.) Dr. Houglan testified that the EMG tested the nerve function in the area where plaintiff was feeling pain, but that the results demonstrated no nerve damage or neuropathy from the back into the right lower extremity. Based upon the normal findings from the EMG, Dr. Houglan explained, sending plaintiff out for a neurology consult was not indicated.

{¶16} Dr. Houglan testified that progress notes from July 20, 2015, show that he saw plaintiff on that date to follow up about the EMG results. (Plaintiff's Exhibit 1, p. 84; Defendants' Exhibit A, p. 84.) As Dr. Houglan related, his assessment noted low back pain with degenerative disc disease, and his plan included discontinuing Relafen in favor of a similar drug, Mobic, in the hope that plaintiff would respond to it better. Dr. Houglan also related that he again recommended stretching exercises. Another note from the next day, July 21, 2015, shows that plaintiff came back to receive another trigger point injection of Kenalog in the right paraspinal muscle, Dr. Houglan stated, and that stretching and Tylenol were again recommended. (Plaintiff's Exhibit 6.)

{¶17} Dr. Houglan stated that he saw plaintiff several months later, on March 1, 2016, and that from his progress note it appears plaintiff complained of "severe back pain" and requested another trigger point injection, which was scheduled for about two weeks out. (Defendants' Exhibit F.) As Dr. Houglan described, his progress notes from March 15, 2016, show that he administered a trigger point injection of Kenalog in the right paraspinal lumbar area at that visit. (Plaintiff's Exhibit 2, p. 300; Defendants' Exhibit G.) And, Dr. Houglan noted, he went over the MRI and EMG results with plaintiff again and discussed how they revealed degenerative disc disease but no radiculopathy

into the lower right extremity; additionally, plaintiff reported that the Mobic he had been taking took the edge off the pain but did not last all day, and although plaintiff reported buying Tylenol as instructed, Dr. Houglan noted that his review of plaintiff's commissary purchases for the last four months showed no Tylenol purchases. In his assessment, Dr. Houglan used the general term "lumbago" to identify plaintiff's condition.

{¶18} From another progress note dated August 17, 2016, Dr. Houglan stated that plaintiff came in for a visit at that time complaining of continued low back pain. (Plaintiff's Exhibit 2, p. 282; Defendants' Exhibit H.) Dr. Houglan noted that plaintiff reported buying "lots of Tylenol in commissary" but that his review of the commissary records showed only two purchases of 100-count bottles in the last three months. Dr. Houglan also noted the aforementioned normal EMG results and the MRI showing narrowing at the L-4/L-5 and L-5/S-1 levels. As Dr. Houglan stated, he requested a consultation with an orthopedic specialist to see if they could find anything to give plaintiff relief, but he explained that the request would have to go through a collegial review process where other practitioners review the case and decide whether to proceed with that plan of care. Dr. Houglan stated that this visit marked the end of his treatment with plaintiff because soon afterward he began working at LorCI. Overall, according to Dr. Houglan the record of his interaction with plaintiff in the progress notes suggested that plaintiff derived some incomplete, temporary relief from the care provided by him through August 2016.

{¶19} Dr. Janice Douglas testified that after many years in practice, including nearly 30 years on the faculty of Case Western Reserve University School of Medicine, in April 2016 she transitioned into a contract role providing medical care at two state correctional institutions, and in August 2016 she began working exclusively at GCI, where she took over as the Chief Medical Officer. Dr. Douglas stated that she has seen plaintiff for appointments several times in the months since she started working at GCI.

{¶20} From progress notes dated September 16, 2016, Dr. Douglas testified that she saw plaintiff on that date to follow up with him on the results of a repeat EMG.

(Plaintiff's Exhibit 2, p. 274-275.)  As Dr. Douglas described, the report from the EMG, which was performed at Franklin Medical Center on September 14, 2016, and focused on the right lower extremity where plaintiff complained of pain, showed normal results. (Plaintiff's Exhibit 2, p. 237-238.)  Dr. Douglas stated that she noted plaintiff's complaint of chronic back pain from a fall, but also that the EMG did not return any evidence of nerve damage, and she wrote that a nurse would give plaintiff a set of standard instructions for back exercises.  Dr. Douglas also stated that while a progress note from a nurse one day later, on September 17, 2016, indicated that plaintiff refused to do his back exercises, she did not know about it and never spoke to plaintiff about it. (Plaintiff's Exhibit 2, p. 273.)

{¶21} Dr. Douglas related that progress notes from October 14, 2016, show that she gave plaintiff two trigger point injections of Kenalog that day, in the right outer hip and in the right lumbosacral area, and that plaintiff tolerated the procedure well. (Plaintiff's Exhibit 2, p. 266-267.)  According to Dr. Douglas, trigger point injections are usually not painful, but depending on the patient there can occasionally be some pain. Dr. Douglas stated that she diagnosed plaintiff with severe sciatica, which she explained is a general term for nerve and muscle inflammation of the lumbosacral area, and that this was the reason for her prescribing Kenalog.  Dr. Douglas testified that her treatment of plaintiff is based upon the symptoms that he presents, and with regard to the history of those symptoms Dr. Douglas recalled plaintiff telling her that he had back problems prior to injuring his back in a fall, and that the fall exacerbated those preexisting symptoms.

{¶22} Progress notes from January 23, 2017, document another visit on that date, Dr. Douglas stated.  (Plaintiff's Exhibit 2, pp. 244-247.)  As Dr. Douglas wrote, the appointment was to follow up on the results of an MRI of the lumbosacral spine that had been recently performed at Franklin Medical Center, but as it turned out the results were not yet available.  Dr. Douglas noted, however, that plaintiff "has some improvement of lower back pain with the las[t] injections & is having no problems today."

{¶23} According to Dr. Douglas, progress notes from February 13, 2017, indicate that this was the last time she saw plaintiff prior to trial, and that the nature of the appointment was to go over the results from the recent MRI of the lumbosacral spine. (Plaintiff's Exhibit 2, pp. 242-243.)  As Dr. Douglas explained, the report from the MRI performed on January 19, 2017, showed no changes from the previous MRI. (Defendants' Exhibit I.)  Dr. Douglas testified that structural abnormalities resulting from inflammation can be detected in an MRI, and that even though no such findings were made in the MRI, it has been her objective finding that there is inflammation fairly localized to a particular area in the right lumbosacral area and that is why she has continued to prescribe trigger point injections.

{¶24} Nurse Practitioner Katherine Beltz testified that she has worked at GCI since 2015 and has seen plaintiff for appointments on at least two occasions for complaints about back pain.  Beltz stated that according to medical records prepared by her, she examined plaintiff on September 18, 2015, for a complaint of low back pain, which plaintiff rated at an 8 out of 10, secondary to sleeping on the floor of the segregation unit, and she noted that he ambulated with a shuffled gait and a walking cane.  (Plaintiff's Exhibit 1, p. 139.)  According to the note, Beltz stated, plaintiff requested another round of trigger point injections, which she wrote would be scheduled.  Beltz also stated that medical records prepared by her show that she saw plaintiff on December 29, 2016, for complaints of increasing back and hip pain, and as a result of the appointment she requested another MRI to evaluate any worsening of his previously diagnosed degenerative disc disease, and she also made a note that plaintiff was supposed to receive his next trigger point injection the following month.  (Plaintiff's Exhibit 2, p. 255-256.)

{¶25} Nurse Practitioner Linda Hancock testified that she has worked at GCI since 2010 and that she recalls seeing plaintiff for appointments at least two or three times.  Hancock related that medical records prepared by her show that she saw plaintiff for an appointment on April 13, 2015, for a complaint of lower back pain that he

attributed to the accident.  (Plaintiff's Exhibit 1, p. 140.)  According to the note, Hancock stated, plaintiff told her that the trigger point injections did not provide relief for very long, and he was taking Relafen twice daily, as well as Tylenol.  The note indicates that plaintiff was wearing a back brace and walking with a cane slowly but without distress, and that resistance testing of his right leg showed it was weak, she stated.  Hancock stated that she also wrote that plaintiff told her the pain was radiating from the right hip all the way down to the right foot.  As Hancock stated, her note reflects that plaintiff had been approved for an MRI at that time, and that her plan for him included continuing the Relafen and following up with a doctor to get another round of trigger point injections.

{¶26} Hancock testified that another record prepared by her corresponds to a March 24, 2016 appointment that plaintiff had due to his being on a "chronic care" caseload for hypertension, and that at this appointment it was noted that plaintiff was taking Relafen and Tylenol and was under stress due to back pain; it was noted that he was limping and that there was weakness in the right leg also.  (Plaintiff's Exhibit 2, pp. 297-299.)  Hancock testified that she also prepared another record corresponding to a routine May 23, 2016 chronic care appointment for hypertension in which notations mention plaintiff having pressure-like low back pain but having a steady gait with a cane, and that he was taking Relafen and receiving trigger point injections.  (Plaintiff's Exhibit 2, pp. 287-290.)  Hancock also testified that another record prepared by her corresponds to a chronic care appointment for hypertension on November 23, 2016, noting low back pain.  (Plaintiff's Exhibit 2, pp. 261-263.)

{¶27} "In order to sustain an action for negligence, a plaintiff must show the existence of a duty owing from the defendant to the plaintiff or injured party, a breach of that duty, and that the breach was the proximate cause of resulting damages." *Sparre v. Ohio Dept. of Transp.*, 10th Dist. Franklin No. 12AP-381, 2013-Ohio-4153, ¶ 9.  "'It is axiomatic that every plaintiff bears the burden of proving the nature and extent of his damages in order to be entitled to compensation.'" *Jayashree Restaurants, LLC v. DDR PTC Outparcel LLC* , 10th Dist. Franklin No. 16AP-186, 2016-Ohio-5498, ¶ 13, quoting

*Akro-Plastics v. Drake Indus.,* 115 Ohio App.3d 221, 226 (11th Dist.1996). "As a general rule, the appropriate measure of damages in a tort action is the amount which will compensate and make the plaintiff whole." *N. Coast Premier Soccer, LLC v. Ohio Dept. of Transp.*, 10th Dist. Franklin No. 12AP-589, 2013-Ohio-1677, ¶ 17. "[D]amages must be shown with reasonable certainty and may not be based upon mere speculation or conjecture * * *." *Rakich v. Anthem Blue Cross & Blue Shield*, 172 Ohio App.3d 523, 2007-Ohio-3739, ¶ 20 (10th Dist.).

{¶28} Upon review, the magistrate makes the following findings. When the truck that plaintiff was helping to unload pulled away from the loading dock, plaintiff began to fall out of the back of the truck toward the concrete pavement about five and a half feet below. In the process of falling, the right side of plaintiff's body struck a metal dock plate that had been engaged between the truck and dock, injuring plaintiff's right side and causing plaintiff to fall more awkwardly. When plaintiff landed on the pavement, the corrections officer with whom he had been working landed on top of him. Plaintiff got up under his own power and slowly walked with the corrections officer to the shift office and then the infirmary. As plaintiff reported to the nurse who examined him in the infirmary, he felt pain in his right hip and leg and in his left elbow, and the nurse noted that the right hip may have sustained a muscle/tissue bruise. Plaintiff was bandaged by the nurse, whose treatment plan included ibuprofen, a muscle rub, and applying ice to the affected areas, and plaintiff then returned to his dormitory.

{¶29} Due to persistent soreness and pain in the right side and back, as well as a wound on the elbow, plaintiff obtained a follow-up appointment with a nurse practitioner, who instructed him to take Tylenol and to apply ice. Plaintiff also underwent x-rays of the right hip and lumbar spine on May 22, 2014, which showed signs of degenerative disc disease in the lumbar spine, but no acute injury. Stiffness and aching pain persisted, however, in the right hip, leg, and back, so plaintiff obtained an appointment with Dr. Houglan on June 13, 2014, at which time plaintiff was given a trigger point injection of Kenalog in the area of pain in the back, and plaintiff was also prescribed a

muscle relaxant.  Plaintiff also began using a walking cane and a back brace during the summer of 2014, but only after falling in a separate accident.

{¶30} By August 6, 2014, plaintiff reported some improvement to Dr. Houglan, and another round of x-rays were taken on August 14, 2014, which again were consistent with degenerative disc disease.  Plaintiff saw Dr. Houglan a few more times over the remainder of 2014, and other than trying some different anti-inflammatory medications, the treatment substantially remained the same, being that plaintiff continued to receive trigger point injections about every 90 days, he was instructed to perform back exercises and stretches, and he was instructed to take over-the-counter Tylenol.

{¶31} Copies of Health Services Request forms or other written communications which plaintiff submitted to the medical department to seek attention include about 11 examples in 2014 of plaintiff seeking care for his lower back or hip pain, but only five more examples after 2014, the last one dated July 9, 2015.  (Plaintiff's Exhibit 1.)  And, after 2014 plaintiff's visits with Dr. Houglan were less frequent.  Although plaintiff continues having appointments with nurses with some frequency, this is at least in part because he is scheduled for recurring chronic care appointments for an unrelated condition.

{¶32} In the summer of 2015, plaintiff underwent an EMG which showed no nerve damage and he underwent an MRI which was consistent with degenerative disc disease.  After Dr. Douglas replaced Dr. Houglan as the Chief Medical Officer in August 2016, plaintiff underwent another EMG in September 2016 which again produced normal results, and he underwent another MRI in January 2017, the results of which were essentially unchanged from the previous MRI.  Similar to Dr. Houglan's plan of care, up to the time of trial Dr. Douglas continued to provide trigger point injections for plaintiff's complaints of inflammatory pain in the lower back, particularly on the right side, and she continued to instruct plaintiff to perform back exercises and stretches.

{¶33} Although plaintiff attributes essentially all his back and hip pain symptoms to the accident, whether on the theory that the accident aggravated his preexisting degenerative disc disease or otherwise, for what would amount at this point to a chronic disabling injury, and asserted in closing that he is entitled to damages upwards of $300,000, plaintiff did not provide corroborating expert witness testimony and the evidence presented at trial fails to substantiate that the accident proximately caused such significant damages.

{¶34} "Although a claimant may establish proximate cause through circumstantial evidence, 'there must be evidence of circumstances which will establish with some degree of certainty that the alleged negligent acts caused the injury.'" *Mills v. Best W. Springdale*, 10th Dist. Franklin No. 08AP-1022, 2009-Ohio-2901, ¶ 20, quoting *Woodworth v. New York Cent. RR. Co.*, 149 Ohio St. 543, 549 (1948). "It is well-established that when only speculation and conjecture is presented to establish proximate causation, the negligence claim has failed as a matter of law." *Harris v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 13AP-466, 2013-Ohio-5714, ¶ 15. "Generally, where an issue involves a question of scientific inquiry that is not within the knowledge of a layperson, expert testimony is required." *Id.* at ¶ 16, citing *Stacey v. Carnegie-Illinois Steel Corp.*, 156 Ohio St. 205 (1951). "Where complicated medical problems are at issue, testimony from a qualified expert is necessary to establish a proximate causal relationship between the incident and the injury." *Tunks v. Chrysler Group LLC*, 6th Dist. Lucas No. L-12-1297, 2013-Ohio-5183, ¶ 18.

{¶35} The symptoms that plaintiff ascribes to the accident are largely subjective in nature, concerning pain emanating internally from his lower back and right hip. Generally, where subjective, soft-tissue injuries are alleged, it is beyond the scope of common knowledge to establish a causal connection and thus requires expert testimony. *Argie v. Three Little Pigs, Ltd.*, 10th Dist. Franklin No. 11AP-437, 2012-Ohio-667, ¶ 15. In this case, though, which included testimony from several treating doctors and nurses and numerous medical records, defendants conceded in their closing

argument that plaintiff likely suffered some soft-tissue type of injury from the fall and is entitled to some damages. Indeed, it is understandable given the circumstances here that plaintiff's awkward fall from the back of the truck onto the concrete pavement would have resulted in some temporary aches and pains. But without providing expert testimony to explain and support his theory, plaintiff goes much farther in arguing that the accident caused him to somehow sustain what amounts to a debilitating, long-term injury.

{¶36} The extensive damages claimed by plaintiff are all the more speculative due to the fact that his symptoms are generally consistent with degenerative disc disease, a naturally-occurring progressive condition which had already caused deteriorative changes at multiple levels of plaintiff's spine at least four years prior to the accident. Whether or not plaintiff acknowledges having any pre-existing back pain, it was clearly shown that low back pain is associated with degenerative disc disease, and Dr. Douglas credibly testified to her recollection of plaintiff telling her that he did have back problems before the accident. Additionally, while an August 14, 2014 x-ray was reported to show an osseous deformity "likely related to [a] remote fracture" at the L-2/L-3 level of the spine, there was no suggestion at trial that this was caused by the accident nor was there any other explanatory testimony about this evidence which may suggest some earlier back injury, thus adding another layer of complexity when it comes to discerning the etiology of plaintiff's back problems. (Plaintiff's Exhibit 1, p. 164.) Also adding to the difficulty in determining the cause of plaintiff's harm is the fact that he testified that he fell in a separate incident sometime after the accident and only then began to use a cane, which begs the question whether this other fall has any causal connection to plaintiff's long-term symptoms.

{¶37} Nevertheless, after careful consideration of the evidence, including numerous medical records and the testimony of treating doctors and nurses, plaintiff plainly suffered acute pain in his right hip and side, as well as a wound on his left elbow, immediately after striking the dock plate and falling from the truck onto the concrete

pavement. Although there was no acute injury to the back noted in the Medical Exam Report made out by the nurse who examined plaintiff after the accident, it does appear more likely than not that plaintiff did sustain some significant strain or other soft-tissue type of injury in the lower back region, particularly on the right side, which manifested in pain soon afterward.

{¶38} From the totality of the evidence, it appears that plaintiff was slow to recover and that the accident proximately caused plaintiff aches and pains for a few months. Plaintiff obtained some relief for his pain, however, through the treatment that he received and his condition was documented to have improved less than three months after the accident. It is probable that plaintiff substantially recovered by the latter part of 2014, as suggested by the diminishing frequency in his requests for medical attention.

{¶39} It is true that into 2015 plaintiff submitted a few more such requests, and also that plaintiff's medical records reflect him consistently rating his pain between 8 and 10 on a scale of 1 to 10 over the long term, and that according to plaintiff he has had almost no relief since the accident and his pain generally remains a 10 out of 10. However, the evidence tends to suggest that plaintiff has exaggerated the extent of his symptoms over the long term. Plaintiff did not give the appearance at trial of an individual suffering from the utterly extraordinary level of pain that one would actually experience at the top end of the 1 to 10 scale, and it was an exaggeration to say that his pain was at that level. Along the lines of exaggerated symptoms, and consistent with plaintiff's probable improvement in the months after the accident, Dr. Houglan noted that plaintiff was more "theatrical" in limping than what his symptoms would otherwise suggest on September 19, 2014, and, again on March 6, 2015, it was noted that plaintiff exhibited a "somewhat exaggerated" appearance. The greater weight of the evidence tends to show that plaintiff's condition has not been as consistently poor as he claims and that he has obtained some relief through his care and treatment, more than was acknowledged at trial.

{¶40} Some pain has obviously persisted in plaintiff's lower back or hip over the long term, but it requires speculation or conjecture to causally relate those symptoms to the accident. Plaintiff did not report any injury to his back when he was examined shortly after the accident, nor did the nurse document observing any obvious injury. Despite subsequent x-rays, MRIs, and EMGs the only diagnosed, objective ailment established from those diagnostic procedures corresponding to the area of pain was degenerative disc disease. The medical testimony established that the symptoms of which he has complained over the long term are consistent with his degenerative disc disease. The evidence adduced at trial did not establish any separate diagnosis of nerve damage or a fracture or other injury to the spine or hip that can be causally related to the accident.

{¶41} The medical testimony explained that diagnostic testing performed in 2010 for an unrelated medical issue established that plaintiff already had degenerative disc disease at least four years before the accident. While plaintiff argued that post-accident MRI imaging showed more damage than was revealed in earlier x-rays, Dr. Houglan's testimony established that an MRI simply shows more detail than an x-ray and that any degradation of the spine may have been natural. The medical testimony characterized degenerative disc disease as a natural process that worsens over time, and to that end x-rays in 2010 noted mild degenerative changes but x-rays in 2014 noted mild to moderate degeneration, and the progress notes from plaintiff's medical file noted "increasing" and "worsening" pain being reported by plaintiff in late 2016 and early 2017, as one might expect to see over time in an individual with degenerative disc disease. (Plaintiff's Exhibit 2, pp. 250, 255.)

{¶42} Plaintiff argued that the accident may have caused an aggravation or acceleration of his degenerative disc disease which resulted in long-term harm, but plaintiff did not provide expert testimony to that effect and the treating physicians who testified at trial did not opine within a reasonable degree of medical probability that this is what occurred. The absence of expert testimony generally precludes recovery where

injuries are "internal and elusive" in nature, and not "sufficiently observable, understandable and comprehensible by the trier of fact." *Wright v. Columbus*, 10th Dist. Franklin No. 05AP-432, 2006-Ohio-759, ¶ 19; *see also Choate v. Tranet, Inc.*, 12th Dist. Warren No. CA2003-11-112, 2004-Ohio-3537, ¶ 17, quoting *Stacey v. Carnegie-Illinois Steel Corp.*, 156 Ohio St. 205 (1951), syllabus ("Because the cause of lower back pain is not within the scope of common knowledge, 'medical testimony is essential.'"). This argument by plaintiff concerns internal, complex facets of the human body which are not sufficiently understandable by a layperson. To find that plaintiff's long-term symptoms represent an acceleration or aggravation of degenerative disc disease caused by the accident, or to differentiate any such long-term symptoms from degenerative disc disease and attribute them in some other fashion to the accident would be speculative in the absence of expert testimony.

{¶43} Even if it were possible that the accident aggravated or accelerated plaintiff's degenerative disc disease, plaintiff's burden was to "establish a probability and not a mere possibility of such causal connection." *State ex rel. Hawkes v. Indus. Comm.*, 10th Dist. Franklin No. 05AP-47, 2005-Ohio-5995, ¶ 4. The treating doctors who testified did not express any such opinion within a reasonable degree of medical probability. While the doctors testified that they documented plaintiff's complaints in which he himself attributed his long-term symptoms to the accident and that they have treated him according to their objective findings and plaintiff's subjective complaints, they did not give testimony sufficient to causally relate plaintiff's long-term symptoms to the accident.

{¶44} Looking at the ways in which plaintiff was harmed by the accident, the soreness and pain that he suffered for a few months was significant and had a negative effect upon his quality of life. While plaintiff offered some testimony about having to take a more menial job in the prison after the accident, he did not establish an entitlement to recover for lost wages. Plaintiff also did not prove an entitlement to recover for any medical expenses.

{¶45} Based upon the foregoing, for the past pain and suffering associated with the injuries caused to plaintiff as a result of the state's negligence, plaintiff is entitled to damages from defendants in the amount of $12,000, plus the $25 filing fee, for a total award of $12,025. Accordingly, it is recommended that judgment be entered for plaintiff in that amount.

{¶46} *A party may file written objections to the magistrate's decision within 14 days of the filing of the decision, whether or not the court has adopted the decision during that 14-day period as permitted by Civ.R. 53(D)(4)(e)(i). If any party timely files objections, any other party may also file objections not later than ten days after the first objections are filed. A party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion within 14 days of the filing of the decision, as required by Civ.R. 53(D)(3)(b).*

ROBERT VAN SCHOYCK
Magistrate

cc:

Richard F. Swope
6480 East Main Street, Suite 102
Reynoldsburg, Ohio 43068

Timothy M. Miller
Assistant Attorney General
150 East Gay Street, 18th Floor
Columbus, Ohio 43215-3130

**Filed July 17, 2017**
**Sent to S.C. Reporter 8/9/17**